United States District Court
Eastern District of Michigan
Southern Division

United States of America,

v.

D-1 Mohmed Ali,

Defendant.
_____________________________/

Case No. 25-cr-20842

Hon. Mark A. Goldsmith

**The United States' Response in Opposition to Mohmed Ali's Motion to Revoke Order of Pretrial Detention**

Mohmed Ali was arrested on October 31, 2025, for conspiring to commit a mass shooting on behalf of the designated foreign terrorist organization ISIS, as detailed in the 93-page Amended Complaint that lays out the extensive steps Ali and his co-conspirators took to prepare for their planned attack. (ECF No. 17, Amended Complaint). He was indicted for offenses associated with this conspiracy shortly thereafter. (ECF No. 36, Indictment).

While Ali claims that the government "only allege[s] that he talked about violent activity," ECF No. 123, PageID.659, his actions tell a different story. Namely, Ali was one of the key individuals who initiated plans to perpetrate a violent attack that he believed would put him and his co-conspirators in the same league as other infamous ISIS terrorists. In the three months before his arrest, Ali purchased a shotgun and an assault rifle and outfitted those firearms with multiple

accessories designed to maximize their lethality. He rented a storage unit later found to contain backpacks, tactical vests, and 24 AR-15 magazines. He scouted potential targets in a local nightlife district along with his co-conspirators. He practiced alongside them at shooting ranges with the firearms he had purchased. And as heard on recorded phone calls, he personally confirmed his commitment to carrying out their planned attack less than a week before law enforcement intervened.

Ali consented to detention following his arrest. He now asks this Court to release him on bond. But as the extensive evidence of Ali's offense-related conduct and dangerousness set forth below makes clear, "no condition or combination of conditions will reasonably assure the appearance of [Ali] as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). He should remain detained pending trial.

## Legal Standard

The pretrial release or detention of a defendant is governed by the Bail Reform Act, 18 U.S.C. § 3142. After a hearing, a defendant must be detained pending trial if "no condition or combination of conditions will reasonably assure the appearance of the [defendant] as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). The government bears the burden of demonstrating by (1) clear and convincing evidence that the defendant is a danger

to the community, or (2) demonstrating by a preponderance of the evidence that the defendant is a flight risk. *See* 18 U.S.C. § 3142(f)(2)(B) (articulating clear and convincing standard for danger to the community); *United States v. Bartlett*, 731 F. Supp. 3d 836, 851 (E.D. Mich. 2024), *aff'd sub nom. United States v. Semenchuk*, 2024 WL 4751486 (6th Cir. 2024) (internal citations omitted) (applying preponderance of the evidence standard to risk of nonappearance).

To evaluate whether a defendant should be detained pending trial, the Court looks to the factors set forth in 18 U.S.C. § 3142(g), which are: (1) the nature and circumstances of the offense, including whether the crime was a "Federal crime of terrorism" as defined in 18 U.S.C. § 2332b(g)(5); (2) the weight of the evidence of dangerousness; (3) the defendant's history and characteristics; and (4) the nature and seriousness of the danger posed by the person's release. *See* 18 U.S.C. § 3142(g).

Additionally, Congress has determined that certain terrorism-related crimes, including the section 2339B charge that Ali and his co-conspirators face, are so serious that there is a rebuttable presumption of detention. 18 U.S.C. § 3142(e)(3)(C) (presumption of detention for any offense listed in 18 U.S.C. § 2332b(g)(5)(B) with a maximum term of imprisonment of ten or more years, which includes section 2339B); *see, e.g., United States v. Musaibli*, No. 18-20495, 2022 WL 1695765, at *10 (E.D. Mich. May 26, 2022) (Lawson, J.) (Section 2339B

charges are "so serious that they trigger a rebuttable presumption of pretrial detention under the Bail Reform Act."). There is probable cause for the indicted section 2339B offense to support the presumption of detention in Ali's case because "[a] grand jury indictment, by itself, establishes probable cause to believe that a defendant committed the crime with which he is charged." *United States v. Hazime*, 762 F.2d 34, 37 (6th Cir. 1985).

This presumption of detention under section 3142(e)(3) imposes a burden of production on the defendant to "com[e] forward with evidence that he does not pose a danger to the community or a risk of flight." *United States v. Stone*, 608 F.3d 939, 948 (6th Cir. 2010). The burden of persuasion to show that the defendant is a danger to the community or a risk-of-flight remains with the government. *Stone*, 608 F.3d at 945. And even if the defendant satisfies his burden of production, the presumption in favor of detention does not disappear; but rather "remains a factor to be considered among those weighed by the district court." *Id.* (citing *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001); *see also, e.g., United States v. Tawfik*, 2017 WL 1457494, at *5 (E.D. Mich. Apr. 25, 2017) (Goldsmith, J.) ("[W]hile Tawfik has rebutted the presumption of detention, consideration of all of the evidence—including the evidentiary weight of the now-rebutted presumption—requires detention").

## Factual Background

Ali is indicted for conspiracy to provide material support or resources to ISIS, in violation of 18 U.S.C. § 2339B, and conspiracy to receive and transfer firearms and ammunition knowing or having reasonable cause to believe that such firearms and ammunition would be used to commit a federal crime of terrorism, in violation of 18 U.S.C. § 924(h). (ECF No. 36, Indictment). Ali conspired to perpetrate this attack with four co-conspirators: Majed Mahmoud (D-2), Ayob Nasser (D-3), Y.N., and S.A. Ali's co-defendants are also in pretrial detention. In fact, a magistrate judge just denied Nasser's motion for pretrial release on August 21, 2026, based largely on the same information contained herein. The evidence of this conspiracy described in the Amended Complaint—along with the additional evidence the FBI obtained during its continuing investigation following Ali's arrest—makes clear that Ali was one of the principal architects of the months-long plot to perpetrate a mass shooting for ISIS, a plot that was only thwarted when he was arrested and detained.

### The Islamic State of Iraq and al-Sham (ISIS)

ISIS, including its various aliases designated by the Secretary of State dating back to its predecessor, "Al Qaeda in Iraq," has been one of the most violent and dangerous foreign terrorist organizations over the past twenty years. At its peak, ISIS ruled over parts of Syria and Iraq equivalent to the size of the United

Kingdom. Although ISIS has lost most of its physical territory, its leaders and official ISIS publications have encouraged their supporters to conduct terrorist attacks in the United States and other Western countries. In the decade leading up to the charged conspiracy, ISIS supporters like Ali and his co-conspirators have heeded that call. For example, ISIS has claimed responsibility for a several mass shooting attacks, including the 2016 mass shooting at the Pulse nightclub in Orlando, which killed 29 people, and the 2015 attacks in Paris where one group of attackers carried out a mass shooting at a theater, another group of suicide bombers struck outside the Stade de France stadium, and a third group of attackers fired on crowded cafes and restaurants. This coordinated ISIS attack in Paris killed approximately 137 individuals and wounded 416. Notably, the evidence in this case indicates that Ali and his co-conspirators sought to specifically emulate these deadly ISIS attacks in Orlando and Paris, and that they had the means and opportunity to do so.

Since the attacks in Paris and Orlando and indeed, in more recent years, ISIS and its followers have continued to engage in similar attacks in the United States and across the world. For example, ISIS has claimed responsibility for the March 22, 2024, terrorist attack conducted by multiple gunmen at Crocus City Hall, a popular concert venue complex near Moscow. That attack killed approximately 130 people and injured numerous others. An ISIS follower also perpetrated a

deadly vehicle ramming attack on January 1, 2025, in New Orleans, where he drove his truck into a crowd and killed approximately 14 individuals and wounded another 57 others.[1] In December 2025, two ISIS supporters with assault rifles engaged in a mass shooting and attempted bombing at a Hanukkah celebration at Bondi Beach in Sydney, killing approximately 15 people and wounding over 40 others. And in March 2026, another ISIS follower, who had already been convicted of attempting to provide material support or resources to ISIS in 2017 and had been released from federal custody in 2024, perpetrated a shooting attack at Old Dominion University, killing one and wounding two others. These are just a few examples of the deadly attacks that ISIS and its followers continue to carry out and a reflection of the danger that ISIS followers like Ali pose.

**June – July 2025:**
**Ali and One of His Co-Conspirators Discuss Plans for a Mass Shooting on Behalf of ISIS**

Starting in at least June 2025, Ali and his co-conspirators sought to add their names to this list of notorious ISIS terrorist attacks as they prepared to conduct their own mass shooting on ISIS's behalf.

[1] The FBI's forensic examination of Ali's cell phone seized at the time of his arrest found that Ali had searched the web using the name of the 2025 New Orleans attacker with the word "flag." An ISIS flag was found in the truck of the New Orleans attacker following that attack.

In the spring and summer of 2025, Ali and S.A. connected with Tomas Kaan Jimenez-Guzel ("Jimenez-Guzel") and Saed Ali Mirreh ("Mirreh") over social media and encrypted communications applications. Ali and S.A. knew each other well before this time and had traveled to Egypt together, purportedly for Arabic language instruction, in the fall of 2024. Ali and S.A. lived in Dearborn, Michigan; Jimenez-Guzel in Montclair, New Jersey; and Mirreh in Kent, Washington. All four shared an interest in and support for ISIS and extremist figures who propagated ISIS ideology, including one such Islamic extremist ideologue (the "Islamist Ideologue," as referenced in the Amended Complaint) who resides in Dearborn, near where Ali and his co-conspirators lived before their arrests.

By June 2025, Ali and S.A. had begun discussing plans to commit a mass shooting on behalf of ISIS with Mirreh and Jimenez-Guzel. S.A. said that he wanted to carry out an attack similar to Omar Mateen, the shooter responsible for the mass shooting at the LGBTQ+ Pulse nightclub in Orlando in 2016. And while S.A. and Ali were planning a mass shooting attack, Mirreh, Jimenez-Guzel, and other like-minded individuals in the United States and abroad (the "Travel Group") planned to support ISIS by traveling to Syria and fighting on its behalf. According to Jimenez-Guzel, the timing of Ali and S.A.'s planned attack could be affected by when the Travel Group left for Syria, and vice versa, given their shared goal of avoiding detection by law enforcement.

At the end of June 2025, Jimenez-Guzel traveled from New Jersey to Michigan to visit Ali and S.A. S.A. picked Jimenez-Guzel up from the bus station and drove him to the shared residence of Ali, Nasser, and Y.N, where Jimenez-Guzel stayed for the next two nights. While there, Ali and Jimenez-Guzel watched a documentary about the 2013 Boston Marathon bombing. Ali indicated that he was inspired by the Tsarnaev brothers who committed that attack. Later during Jimenez-Guzel's trip, Ali and Jimenez-Guzel re-watched the same documentary, but this time with Nasser and Y.N. While they watched together, Ali commented on mistakes that the Boston Marathon bombers had made during the attack; Nasser and Y.N. laughed at Ali's commentary.

When the FBI later performed a forensic examination of Ali's phone following his arrest, the FBI found evidence that he had searches the web for the following phrases: "boston marathon bombing number of deaths," "marathon bombing victims names," and "did the marathon bombers kill more people after."

**July – September 2025:**
**Ali and His Co-Conspirators Begin Stockpiling Firearms**
**to Use for Their Planned Attack on Behalf of ISIS**

Less than a month after his trip to visit Ali and S.A. in Michigan, on July 27, 2025, Jimenez-Guzel and others discussed traveling to Syria to join ISIS on an encrypted group call. During the call, Mirreh told the group that he tried to convince Ali and S.A. to join their planned travel, but that they planned to stay

behind and do "the same thing as France."[2] Just prior to Mirreh's statement, Jimenez-Guzel told the Travel Group, "Yeah we're not coming back, bro we are gonna die there [in Syria] Inshallah . . . unless the Emir [commander] sends you to Paris for a 2015," a reference to the 2015 ISIS attacks in Paris. Jimenez-Guzel also said, "knowing [S.A.] it's probably going to be at like a club, a disco," just like the targets in the Paris and Orlando ISIS attacks referenced above.

Consistent with what Ali and S.A. told Jimenez-Guzel and that Jimenez-Guzel and Mirreh had reported to the Travel Group on the July 27, 2025, call, Ali and his co-conspirators began acquiring firearms and practicing with them shortly thereafter. On August 24, 2025, Ali—who worked at his parents' auto-shop but otherwise had no regular employment—purchased a Beretta shotgun from an online retailer for approximately $1,789.89, and he purchased a Palmetto State Armory (PSA) Sabre AR-15 style rile on September 13, 2025, for approximately $1,037.58. On September 3, 2025, Nasser purchased a Daniel Defense DDM4 AR-15 style rifle from an online retailer, paying approximately $1,490.60. The FBI discovered that Ali had posted a photo online depicting what appeared to be the same DDM4 rifle on a bed (shown below).

---

[2] The call participants referred to Ali as "Bukhari" and S.A. as "Athari." The FBI later determined, and Jimenez-Guzel and Mirreh both confirmed, that the participants were referring to Ali and S.A., respectively.



Ali also spent hundreds of dollars on accessories compatible with AR-15 rifles like those he and Nasser had purchased, including a holographic site "built for close-quarter engagements with fast moving targets," a collapsible "mil-spec" carbine stock, a special grip allowing for "maximum weapon control in adverse environments," a muzzle brake to reduce kickback, and what appeared to be a Forced Reset Trigger (FRT), which is an accessory that allows an individual to rapidly increase the rate of fire in a semiautomatic weapon to maximize casualties.

**September 2025:**
**Ali and His Co-Conspirators Scout Potential Attack Locations in Michigan and the Midwest**

On September 19 and 20, 2025, Ali traveled with S.A.—and, on the first night, both S.A. and Mahmoud—to downtown Ferndale, Michigan, to scout possible attack targets. Based on cell phone location data, the three co-conspirators visited an area of downtown Ferndale from approximately 11:45 p.m. to just after

midnight on September 19. The area of Ferndale to which they traveled that night has numerous bars and restaurants, including many that intentionally attract members of the LGBTQ+ community. Ali and S.A. returned to the same area of downtown Ferndale the following night, September 20, 2025, from approximately 11:30 p.m. until midnight. The FBI's forensic review of Ali's cell phone revealed a search for "boogie fever Ferndale," referencing one of the establishments in the area of downtown Ferndale that Ali and his co-conspirators scouted. These potential targets were consistent with Jimenez-Guzel's understanding, based on his conversations with Ali and S.A., that they would target a club. Ali's cell phone also included the search "kill who does it and who its done to homosexual hadith,"[3] and searches related to the Pulse nightclub shooting, including "why did omar Mateen shoot that night club" and "officers that died pulse night club"—further confirming Ali's specific interest in emulating the ISIS-inspired attack perpetrated by Omar Mateen at Pulse nightclub in Orlando. A forensic review of Y.N.'s phone showed that he, too, accessed articles about Omar Mateen and FBI press releases on investigative updates from the Pulse nightclub shooting. And S.A. also used his phone to access the following image on September 8, 2025, which appears to be a screen shot of a video game rendering titled "Pulse Night Club anniversary" (pictured below):

[3] A "hadith" refers to an account of the words or actions attributed to Muhammad.




In addition, in early October 2025, S.A. accessed a 4-page PDF titled "Inspired Guide Orlando Operation," an article about the ISIS-inspired Pulse nightclub attack, published in June 2016.

Two of Ali's co-conspirators, Nasser and Y.N., separately scouted another potential target around the same time Ali, S.A., and Mahmoud visited Ferndale. On September 18, 2025, based on cell phone location data, Nasser and Y.N. drove from Dearborn to Cedar Point amusement park in Sandusky, Ohio, stayed there less than an hour while the park was closed, and then returned to Dearborn. The following day, Nasser and Y.N. returned to Cedar Point, stayed approximately five and a half hours, and then returned home. The search history from a computer later seized from the residence of Ali and Nasser revealed searches conducted prior to

the September 18 and 19 trips to Cedar Point that included "is it crowded on halloweekend at cedar point" and "when does halloweekends start at cedar point," apparently in an effort to maximize the body count of their attack.

**September 2025:**
**The Travel Group References the Planned Attack by Ali and His Co-Conspirators Again**

On September 22, 2025, Jimenez-Guzel and others had another encrypted group call like the July 27, 2025, call. During this September 22 call, Jimenez-Guzel and the other participants again discussed traveling overseas to join ISIS, and Jimenez-Guzel referenced "brothers doing something else while we go… Like a nice surprise. That's all I'm going to say." The "nice surprise" Jimenez-Guzel referred to on September 22 was a reference to the same attack to which Mirreh and Jimenez-Guzel had alluded in the Travel Group's July 27 group call when they said that Ali and S.A. were staying behind to do "the same thing as France."

**September 2025:**
**Ali Rents a U-Haul Storage Unit to Store Tactical Vests, Backpacks, and Ammunition Magazines**

One day after the September 22, 2025, group call, Ali rented a small U-Haul storage unit in Inkster, Michigan, measuring 4x6x8 feet. Security footage shows that Ali and Nasser had visited the same U-Haul facility together on August 14 (as depicted below), just weeks before they began purchasing firearms. At the time Ali

rented the U-Haul unit on September 23, Nasser was listed as an alternative contact for the account and had authorized access to the unit.







U-Haul's Records show that the unit Ali rented was accessed on September 23, September 28, and October 9, 2025. The FBI searched the unit on October 31, 2025, at the time of Ali's arrest, and found two chest rig vests designed to hold ammunition magazines, two identical black backpacks, 24 unopened AR-15 magazines, and a receipt for the purchase of 30 AR-15 magazines dated September 21, 2025, with Ali identified as the buyer (see photos below). These magazines were compatible with the firearms Ali and his co-conspirators purchased.





**September – October 2025:**
**Ali and His Co-Conspirators Practice at Shooting Ranges as the Travel Group Again References Their Plans for the Mass Shooting**

Beginning in September 2025, Ali and his co-conspirators visited gun ranges to practice firing weapons. On September 25, 2025, Ali and Nasser attended a gun range in Belleville, Michigan. Ali brought a gun resembling the Sabre AR-15 rifle that he purchased earlier that month. The two also bought 2 boxes of 50 rounds of 5.56mm ammunition. One day later, Mahmoud purchased a PSA PA-15 multicaliber AR-15 style rifle.

Separately, on October 3, 2025, Jimenez-Guzel and others from the Travel Group had another encrypted group call to discuss their planned travel to join ISIS. One of the call participants stated, "We could just attend the shooting range once, twice, three times practice with toys a few times . . . it's all subject to the decisions and the command of the Emir." The participant then stated, "I'm even thinking of pulling an Athari [S.A.], but probably not here, probably over there. But now

when's Athari [S.A.] doing his doing his magic? Not magic." Mirreh then responded, "Dude the thing with Athari [S.A.] is right is um, it would have been bad if I don't know, [Glory be to Allah]. Whatever, whenever we do our thing our first thing then he will do his you know? We're in a great time hey he's doing his thingy they're they're doing their own thingy right they're doing their own thingy…" Based on the context of this exchange and the common participants of the other two calls involving the Traveler Group, "pulling an Athari [SA]" was a reference to S.A.'s intent to carry out an armed attack with Ali and their other co-conspirators.

Days after the Travel Group's October 3, 2025, call, Mahmoud ordered over 1,600 rounds of 5.56mm ammunition—ammunition that is compatible with the AR-15 style rifles purchased by Ali, Nasser, and Mahmoud over the previous month. According to UPS records, Mahmoud received this bulk purchase of ammunition on October 9, 2025. And based on cell site location data and security camera footage, Ali and Mahmoud visited the U-Haul storage unit together that same day and Mahmoud held a large box when they departed (as depicted below).




Ali and Mahmoud also visited a gun range on October 8, 2025. Ali brought his own weapon to shoot, and the two purchased two boxes of 5.56mm ammunition. Ali, Mahmoud, and Nasser also returned to practice shooting at the range on October 16, 2025. They did not rent any weapons, suggesting they brought their own for practice. They did, however, purchase 5.56mm ammunition at the gun range, despite the fact that Mahmoud had received his bulk purchase of 5.56mm ammunition a week earlier. Their purchase of additional 5.56mm ammunition to use for shooting practice at the gun range on October 16, 2025, further confirms that Mahmoud was stockpiling the over 1,600 rounds of 5.56mm ammunition he had already received—in preparation for the armed attack Ali and his co-conspirators were planning.

According to information located on his seized cell phone, on October 18, 2025, two days after this visit to the gun range, Mahmoud purchased a 3-pack of

balaclava ski masks online and those masks were delivered on October 22, 2025, to his home address. Information located on Y.N.'s seized cell phone indicates that Y.N., too, had ordered a 3-pack of balaclava ski masks on October 15, 2025.

As the timing of their actions and surrounding communications recounted further below make clear, Ali and his co-conspirators purchased an arsenal of weapons and related supplies, stockpiled thousands of rounds of ammunition, and went to shooting ranges to prepare and practice for their planned mass shooting for ISIS. And the co-conspirators told other ISIS supporters about their plans. For instance, in September 2025, after his visit to Dearborn and many conversations with Ali and S.A. about the planned attack at a club, Jimenez-Guzel called Ali and S.A. He asked them if they were training and if they knew how to use guns. Ali and S.A. specifically told him that they were going to the range to practice.

**September – October 2025:**
**Ali and His Co-Conspirators Communicate About Martyrdom and Potential Attack Dates**

Throughout September and October 2025, Ali and his co-conspirators also exchanged WhatsApp messages in an encrypted WhatsApp chat group titled "Muslimeen," in which they were the only participants. On October 9, 2025, Nasser sent the group a message about a new car. Y.N. responded, "I'll be dead before it gets here." S.A. also discussed dying and going to "paradise" with Ali over the phone around the same time. On October 15, 2025, Ali told S.A. that he

was fearful. S.A. responded, "The way I see it, is that . . . this is the closest I am to deciding, like, to knowing I am going to Jannah [paradise], [God willing]. If I die in any other way, I'd be ten times more scared that I'd be going to Jahannam [hell], you understand?" Ali then responded, "Yeah, that is true, [God willing]."

In other communications, S.A. and Ali discussed going to the gun range to improve their shooting skills. For example, in a phone call between Ali and S.A. on October 17, 2025—the day after Ali, Nasser, and Mahmoud had gone shooting—Ali and S.A. discussed S.A. going to the range and Ali stated, "When you go, [God willing], you going, will also be another factor to prove … the change. It will all make sense later. But you, try to, try to shoot, try to learn how to shoot … It's not as easy as you think." Later that same day, just as Ali and S.A. had discussed, S.A. attended a gun range in Brownstown, Michigan. S.A. rented and fired a handgun, a shotgun, and an AR-15 style rifle.

The conspirators also began to use code words such as "pumpkin" and "fireworks" to communicate about potential attack dates. The term "pumpkin" appeared to refer to an attack date on or near Halloween, and "fireworks" appeared to refer to a date on or near New Year's Eve. In a WhatsApp chat on October 18, 2025, Nasser messaged: "I like fireworks," and S.A. responded: "I hate fireworks. I'm allergic to..Fireworks…Aww man….I guess no fireworks." S.A. then sent the group four pumpkin emojis in a row. Ali responded "HAHAHAHA," and Nasser

replied with a firework emoji and "Woohoo." S.A. responded to Nasser's firework emoji with the word "Garbage" and sent an emoji of a trash can with 2026 inside. S.A. sent an emoji of a pumpkin in a treasure chest, possibly reflecting S.A.'s preference for an attack date on or near Halloween. S.A. then sent emojis of 2026 on a dumpster, and a pumpkin overlayed on a building, again expressing a preference for Halloween. Later that day, in a recorded phone call with Ali, S.A. said he did not want to wait any longer and that "we have been preparing for all of this," and, "Listen, I'm going to speak to [Nasser] and [Y.N.] but I'm gonna speak to you … I don't think they wanna wait that long either. No way."

In a phone call on October 19, 2025, the next day, Ali and S.A. continued to discuss the date of their planned attack. S.A. appeared to stress his view that they should not delay, stating, "bro, I just don't see the benefit in delaying it. I am not going to lie … It's not worth, the, the delaying it, that's what I am trying to say, I am saying the reward is still there . . ." Ali then said, "Too bad … you think it's going to be five tough guys and going to … five tough guys that just go into it…" At around the same time, Nasser can be heard yelling in the background, "[I swear to God], no, [I swear to God]."

On October 23 and 24, 2025, Ali and his co-conspirators exchanged more WhatsApp messages. Ali and S.A. posted videos of their trips to the gun range, and S.A. messaged the group "American Jewish Center," to which Nasser responded,

"pumpkin sounds good now." On October 24, 2025, Ali and his co-conspirators exchanged more messages related to the timing of a potential attack. S.A. sent the WhatsApp group an article about a civil lawsuit that recently had been filed against Nasser, stating, "Damn now your extra cooked bro aww man I guess pumpkin it's ok bro I guess ok I guess pumpkin then bro damn ok I guess." Ali responded with a sticker of a masked and hooded individual in black clothing with his right index finger pointed up with the rest of his fingers in a closed fist (pictured below):



The gesture of pointing one's right index finger up is commonly used by ISIS members and supporters.

Also on October 24, 2025, Ali and S.A. spoke on the phone about "pumpkin." S.A. specifically asked Ali, "Are you gonna do pumpkin?" and Ali responded, "[By God] [by God,] I would love to, you know [by God], [by God] like genuinely, deep in my heart, [by God] I would love to, I would love to." Ali then stated, apparently using coded language to refer to attacks as "weddings":

"Imagine weddings back-to-back. Wow, how beautiful, back-to-back, uh, whatever uh, cakes. Beautiful, woohoo, anniversary for real." S.A. later stated, "Think about it, there won't be a day left for … an attack . . . and if someone else offer to make another day and claim every day of the year . . . when they claim every day of the year, that brother did it on that day, we got to do it another day." Later in the call, S.A. told Ali, "So ya, I talked to my brothers. We are going to do pumpkin" and "I talked to my brothers [Nasser] and [Y.N.], they said it is getting bad. So we gotta do pumpkin, ya." That same day, Ali, S.A., and Y.N. visited a gun range together. Ali brought his Sabre AR-15 style rifle and both S.A. and Y.N. practiced shooting with it, as well as another rented rifle.

Finally, on October 28 and 29, 2025, in recorded phone calls, Ali and S.A. discussed their effort to seek guidance from the father of the Islamic Ideologue, who resides in Dearborn near Ali and his co-conspirators but is also known more widely for his radical Islamic views and vocal support of Islamic extremist ideology consistent with that of ISIS. On October 28, S.A. told Ali that he tried to call the Islamic Ideologue's father, but that the father did not answer and S.A. appeared to suggest that he left a voicemail or message. S.A. said to Ali, "call him or I'll call him," and Ali asked, "the pumpkin?" S.A. responded, "No, I just asked him, like, 'how do you know if the dream is answered?' I told him I got a dream

that, pretty much like what you told me. I had a dream of doing a good deed and then it was earlier than when I decided and wait for his answer."

S.A. called the Islamic Ideologue's father again the next morning, on October 29, 2025, and reached him. In that recorded call, S.A. said that he had an "intention to do a good deed," but was "indecisive" about what day to do it. The father of the Islamic Ideologue told S.A. that for a "good deed, just go ahead, right away, no hesitation." S.A. then called Ali and described his call, telling Ali that the Islamic Ideologue's father told him that "if you have something good, do it right away." That same day, based on the FBI's review of Ali's seized cell phone, Ali sent S.A. a message on Telegram in which Ali asked S.A. to post two videos in a particular group chat. One of the videos Ali sent for S.A. to post was a video featuring the Islamic Ideologue in which he states, "it's time the mothers nurse their infants with the love of jihad and the ambition of wanting to become a mujahid [a jihadist fighter] and shaheed [martyr]." The FBI's review of Ali's seized phone also revealed that Ali had searched the web for other information about the Islamic Ideologue and his "lectures." Evidence of S.A.'s activity on his social media accounts also confirmed S.A.'s familiarity with the Islamic Ideologue and his teaching. Indeed, S.A.'s profile picture on one of his accounts was a picture of the Islamic Ideologue.

**October 31, 2025:**
**The FBI Locates and Seizes the Firearms, Components, and Ammunition Ali and His Co-Conspirators Stockpiled**

On October 31, 2025, the FBI executed search warrants at several locations including the shared residence of Ali, Nasser, and Y.N., as well as S.A.'s and Mahmoud's residences. In Ali, Nasser, and Y.N.'s residence, officers seized, among other things: the DDM4 AR-15 style rifle that Nasser had purchased on September 3, 2025, with an attached optic, red-dot sight, and pressure switch; the Sabre AR-15 style rifle that Ali purchased on September 13, 2025, with an unattached red-dot sight, tactical flashlight, and an installed forced reset trigger; eight 5.56mm extended magazines; a Beretta 12 gauge shotgun with an attached optic that appeared to match that which Ali purchased on August 24, 2025; two loaded, Sig Sauer 9mm pistols; a CZ 9mm pistol with two empty magazines; a black flash suppressor; two GoPro cameras; a Survivor HK-695 stainless knife with black sheath; a tactical flashlight; an opened UPS package addressed to Nasser containing an AR-15 firearm stock; an opened UPS package addressed to Nasser containing a JP Enterprises Silent Captured Spring and Geissele Automatics trigger components; a box addressed to Nasser containing two black Rapid Response tactical vests with magazine holders; and an Amazon box

addressed to Y.N. containing a weapon sight, tactical flashlight, optic, sling mount, and laser.

In Mahmoud's bedroom, agents seized, among other things: the PSA PA-15 multicaliber AR-15 style rifle that he purchased on September 26, 2025; a box with two containers holding the approximately 1,680 rounds of 5.56mm ammunition that he purchased in early October 2025; two rifle magazines with ammunition; five opened rifle magazines and five unopened rifle magazines without ammunition; a Mossberg 12 gauge shotgun loaded with five slugs; additional shotgun slugs; a USPS package addressed to Mahmoud containing a JP Enterprises Silent Captured Spring and a Geissele Automatics Super Dynamic 3 Gun AR-15 trigger; and a gear package with a tactical chest rig.

At S.A.'s residence, the FBI seized S.A.'s cell phone. Data from S.A.'s cell phone showed that he participated in numerous Telegram channels where he and other users shared ISIS propaganda and related materials, including on channels containing posts justifying violence, mutilation, and the killing of non-Muslims, as well as audio and video lessons on topics including the ISIS caliphate and martyrdom operations, among other Islamic extremist content.

In addition, the FBI seized S.A.'s desktop computer and identified a documented titled, "The Final Letter of," which began, "My name is S A , and I was one of the brothers who planned and carried out the A of 1 / 1/202 and this

is my final letter to the Americans rather to the disbelievers as a whole, those who claim to be Muslim, and my beloved brothers."[4] S.A.'s letter went on for another four and half pages in which he explained his grievances involving American foreign policy and then praised al Qaeda- and ISIS-inspired attackers including Omar Mateen, the Pulse nightclub shooter, and the Tsarnaev brothers, the Boston Marathon bombers. Based on metadata associated with S.A.'s letter, he created the file on October 7, 2025, and last modified it on October 21, 2025.

**Ali's Consumption of ISIS Propaganda and Attack-Related Internet Searches**

Since the October 31, 2025, arrests, the FBI has reviewed voluminous data obtained from electronic devices used by Ali and his online accounts and has discovered additional evidence of his intent to perpetrate a violent, ISIS-inspired attack. Specifically, Ali accessed numerous ISIS propaganda items on his cellular phone. For example, the FBI's forensic review of Ali's phone identified information indicating that Ali was part of a Telegram group in which another user posted copies of all 13 issues of the official ISIS English-language magazine, Rumiyah, as well as well as copies of the successor ISIS magazine, Dabiq, on October 24, 2025. Rumiyah featured stories from individuals who traveled to ISIS-controlled territory, and included explicit direction from ISIS urging ISIS

---

[4] S.A.'s letter appeared to include intentional gaps in place of his name and the date of the conspirators' "A      " (attack).

supporters in the West to carry out violent attacks in their home countries, along with a recurring series of articles called "Just Terror Tactics" that contained instructions on how to carry out such attacks using knives, vehicles, and other means. Ali was also part of a Telegram group in which another user shared a video produced by Al Hayat Media Center, one of ISIS' official propaganda entities, called "Incite the Believers" on October 20, 2025. "Incite the Believers" is an English-language video released in 2020 that urged ISIS followers in America to commit arson attacks, particularly where they did not possess other weapons and were unable to travel to fight for ISIS abroad. The FBI's review of Ali's phone also indicated that he had searched for information about "Jihadi John," the infamous British ISIS member seen beheading captives in ISIS-produced videos in 2014 and 2015.

The FBI also recovered information from a desktop computer Ali used indicating that he drafted a PowerPoint presentation in October 2025 titled, "The Crime of Silence: A Guide to Avenge Your Ummah [the Islamic community]" (pictured below).




Other information FBI located on Ali's seized phone indicates that he had drafted notes for a script to accompany this PowerPoint presentation and that he saved a draft of the script that he may have generated by prompting artificial intelligence software. Specifically, notes on Ali's phone from July 2025 indicate that he intended to generate a script that discussed "the virtues of j1h@d [jihad] and being a shaheed [martyr] and inspiring one another to fight in the cause of Allah…" as well as to "remind them [the youth] of quickly understandable quotes that remind them that the death of a shaheed is far better for them to get their blood pumping and that you only die once so why not seal it with sacrificing yourself for the sake of Allah." The FBI recovered a draft of what appears to be the script Ali generated based on these notes, which included, "If you don't die as a martyr—you'll still die anyway … But I swear by Allah—my heart is certain. My soul is too free to accept

humiliation. And my blade is sharp … And look to the martyr … He is forgiven with his first drop of blood." As this presentation and other information the FBI has recovered regarding Ali's digital footprint indicates, he was committed to pursuing vengeance through violent jihad and martyrdom, consistent with the ISIS propaganda he had accessed in the months leading up to his arrest.

The FBI's review of Ali's phone also revealed that he had searched for information about other mass casualty attacks like those that he and his conspirators sought to perpetrate. For example, in addition to Ali's web searches about the Pulse nightclub shooting and the Boston Marathon bombings referenced above, Ali searched for information related to the perpetrator of the 2017 Las Vegas mass shooting; the 2017 ISIS bombing at an Ariana Grande concert in Manchester, England; the 2019 mass shooting at a mosque in Christchurch, New Zealand; and the 2012 mass shooting at a movie theater in Aurora, Colorado.

And Ali conducted other queries using the ChatGPT artificial intelligence application reflecting his conscious preparation for a mass shooting in which he would be killed. In June 2025, he asked ChatGPT, "does the martyr feel the pain of the angel of death extracting his soul out of his body." Four months later, on October 16, 2025, he asked, "If a son who's 20 dies does the money in his bank go to his parents." Later that same day, he asked, "Is getting shot in the lung like

drowning," and after getting information regarding how to respond after being shot in the lung, he asked, "How long before they black out."

Ali's ChatGPT queries also reflect the conversations he was having with S.A. and his other conspirators in October 2025 regarding the timing of their attack, as described above. On October 12, 2025, about three weeks before Halloween and his arrest, Ali wrote to ChatGPT, "I'm currently stressed and could say depressed about something that I was numb to and had no issues but the overthinking that I used to brush off so easily is starting to get to me even though I easily refute it … Originally I had a plan to do something that was 3 months in advance and I was fine and planning for it and had no problem and I recently changed it to 3 weeks and out of no where like instantly a day after the wiswas [whisperings] and shubahat [doubts] came raining in … How can I bring my heart to ease." He added, "This is a plan between me and a friend and he was going through what I was going through then it automatically switched roles [Glory be to Allah] he's completely fine and thabit [firm] noe [now]. As described above, just over a week after sending these prompts to ChatGPT, Ali told S.A. that he still "would love to" do the attack they planned, and five days later—just two days before Halloween—they discussed the guidance they got from the Islamic Ideologue's father that for a "good deed, just go ahead, right away, no hesitation."

**October and November 2025:**
**The Arrest of Ali and His Co-Conspirators, and Ali's Pretrial Detention**

The FBI arrested Ali and two of his coconspirators, S.A. and Mahmoud, on October 31, 2025. Ali's other two conspirators were arrested days later. As confirmation of how real and dangerous the Dearborn conspirators' attack plan was, Jimenez-Guzel, Mirreh, and other members of the Travel Group accelerated their travel plans after learning of the arrests in the news. In fact, after the original complaint detailing much of the Dearborn attack plot conspiracy was unsealed on November 3, 2025, Jimenez-Guzel told an FBI Confidential Human Source that "[t]he feds are gonna be looking for us in a week maybe, so we are leaving today or tomorrow…" and that the conspirators in Dearborn "were planning to do something. I'm not gonna say what, but do something here." The next day, Jimenez-Guzel and Mirreh obtained tickets to depart the United States within twenty-four hours, and they were both arrested and charged in the District of New Jersey before they could board those flights. In July 2026, both Jimenez-Guzel and Mirreh pled guilty to conspiring to provide material support or resources to ISIS, in violation of section 2339B, in connection with their plan to travel to join ISIS as fighters abroad.

Ali consented to detention ten days after his arrest, on November 10, 2025. (ECF No. 33). A grand jury returned an indictment charging Ali, Nasser, and Mahmoud on November 12, 2025. (ECF No. 36).

## Argument

### I. There is a presumption of detention in this case, and Ali has not rebutted it

The presumption in favor of detention exists in this case, which Ali does not dispute. (ECF No. 123, Ali's Motion to Revoke Order of Detention, at PageID.658). And Ali has not met his burden of production to show that he is not a flight risk or a danger to the community. Disregarding the evidence of his and his co-conspirators' planning and preparation for an attack on behalf of ISIS as recounted above, Ali claims that the "government speculates that his actions were more than mere talk, that they constituted planning a violent attack." (ECF. No. 123, PageID.661). To be sure, Ali certainly talked about his planned attack—including saying that "genuinely, deep in my heart, [by God] I would love to" do the attack only a week before his arrest—but he also took numerous steps to put his intended plan into action. These steps included scouting and researching potential targets on the internet, acquiring multiple firearms and components meant to maximize their lethality, training with his co-conspirators at local gun ranges, and discussing the pros and cons of potential attack dates. Ali's contention that he is being held on mere speculation runs contrary to the weighty evidence of his and his co-conspirators' conduct (which has been produced to Ali in discovery), and his arguments in this regard do nothing to rebut the presumption of detention here.

Ali also points to what he describes as a "stable home life and complete lack of criminal history or violent history," *id.*, PageID.659, which are insufficient to rebut the presumption. "Although a defendant's burden of production is not heavy, he must introduce at least some evidence" that he is not a risk of flight or a danger. *Stone*, 608 F.3d 945 (internal quotation omitted). Here, Ali has not presented any evidence—he merely argues that his home life was "stable" prior to his arrest and points to a lack of a criminal history. Such arguments based on the absence of previous criminal conduct are not sufficient to rebut the presumption, as other courts have found. *See, e.g.*, *United States v. Hernandez*, 2002 WL 1377911, at *3 (E.D. Tenn. Feb. 27, 2002) (defendant failed to rebut presumption despite "family and employment ties" to the local community); *United States v. Dillard*, 2023 WL 313856, at *2 (S.D. Ohio Jan. 19, 2023) (defendant failed to rebut presumption by "pointing to evidence that he did not violate his supervised release following his most recent federal conviction"); *United States v. Smith*, 2022 WL 16957876, at *3 (N.D. Ohio Nov. 16, 2022) (defendant failed to rebut presumption despite producing "letters attesting to his ties to the community and his family," and calling a witness who testified that defendant previously worked for her father and that he could return to live with her if released).

Moreover, Ali's argument regarding his home life before arrest is dubious, given that Ali's home environment apparently facilitated his criminal conduct. Ali

lived at home together with his parents prior to his arrest, and this environment apparently allowed for—and certainly did not prevent—his radicalization, nor his decision to plan a mass shooting attack for ISIS. This is the same home where Jimenez-Guzel met Ali, Nasser, and Y.N. in the summer of 2025, and where Ali discussed his intention to carry out an attack. It is also the home where Ali, Nasser, and Y.N. received shipments of multiple firearms and firearms components in the months leading up to their arrests, apparently without any interference from Ali's parents.

Ali also challenges the individual danger factors identified in the Pretrial Services Report to support detention based on danger to the community—the nature of Ali's offense, his criminal associates, his alleged extremism, his weapons ownership, and the risk he poses to the community—as resting on unproven allegations. (ECF No. 123, PageID.659–60). But these factors are not free-floating assertions; each is independently supported by the evidence recounted above, which consists of Ali's own recorded statements, his own purchases, and items recovered from a storage unit he personally rented and a residence he personally occupied. The defense further implies that something beyond a proffer of this information should be required, but the government has produced voluminous discovery substantiating its allegations in this case, and Ali has not undermined a shred of it in his motion for release.

Ali also argues that he has no "criminal associates," because his co-defendants are presumed innocent and have not pled guilty. (ECF No. 123, PageID.660). That argument overlooks that two of his ISIS-supporting associates—Jimenez-Guzel and Mirreh, members of the Travel Group with whom Ali and S.A. were in direct and repeated contact about their attack plans—have already pleaded guilty to conspiring to provide material support or resources to ISIS. Ali's contacts in this conspiracy are not merely presumptively innocent co-defendants; they include individuals who have admitted, under oath, to conspiring to achieve similar extremist ends to those Ali was pursuing. They also attempted to flea the United States to join ISIS abroad shortly after learning of Ali's arrest.

## II. The 3142(g) factors strongly favor Ali's continued pretrial detention

Even if the Court finds that Ali has rebutted the congressionally mandated presumption of detention, the government easily carries its burden of persuasion that the 3142(g) factors weigh overwhelmingly in favor of Ali's continued pretrial detention.

### a. The nature and circumstances of Ali's charged offenses

The severity of Ali's charged offenses cannot be overstated. And while Ali laments that the factors governing pretrial release "rel[y] on adopting the government's allegations as true before they have faced any adversarial testing," (*id.*, PageID.660), the Bail Reform Act directs the Court to consider the charged

conduct when evaluating the propriety of the defendant's pretrial release. 18 U.S.C. § 3142(g)(1). Simply put, Ali's presumption of innocence is not relevant for purposes of his motion for release on bond. But his charged conduct is. And it is of the most grave and dangerous variety.

As described above, Ali and his co-conspirators conspired to commit a mass shooting on behalf of ISIS and acquired numerous firearms and ammunition in the process. He and his co-conspirators openly discussed these plans with other individuals, including Jimenez-Guzel and Mirreh, and with each other. And Ali was one of the key architects and drivers of the conspiracy. Roughly two months after Ali and S.A. discussed their intention to carry out an attack with Jimenez-Guzel while he was staying at Ali's home, and one month after Jimenez-Guzel and Mirreh referenced that attack in call with others in the Travel Group, Ali purchased a Beretta shotgun and then a Sabre AR-15 style rile. He also spent hundreds of dollars on firearm accessories—including a forced reset trigger the FBI later found installed in the Sabre rifle he had purchased—designed to maximize the lethality of those weapons.

Less than a week later, Ali, S.A., and Mahmoud scouted potential attack targets in Ferndale, Michigan, which is known for having numerous clubs and bars which intentionally attract members of the LGBTQ+ community—the same community targeted in the Pulse nightclub attack that Ali's phone shows he

specifically researched. S.A., Ali, and Mahmoud traveled together for the first Ferndale trip, late at night, on September 19. S.A. and Ali returned to the same area, around the same time, a day later. Given the timing of their presence in Ferndale and the evidence of their religious radicalization, Ali and his co-conspirators were not there to patronize any of these establishments or for any other non-nefarious purpose.

Around the same time, Nasser and Y.N. made their trips to Cedar Point to scout that location as an attack target, with Ali's knowledge. Nasser specifically visited Cedar Point's calendar and hours webpage in the days prior to his trips in September, and specifically searched "when does cedar point open" and "when does cedar point close." And yet, on September 18, Nasser and Y.N. drove more than two hours to Cedar Point and arrived more than six hours before the park opened to visitors. Nasser and Y.N. had calls with Ali during both trips.

Then on September 23, one day after a call with members of the Travel Group in which Jimenez-Guzel referenced a "nice surprise," Ali personally rented the storage unit in which backpacks, tactical vests, and dozens of ammunition magazines were later recovered.

In October 2025, leading up to his arrest, Ali continued to actively participate in the conspiracy. On October 8, 2025, Ali and Mahmoud visited a gun range together. They visited the storage unit Ali had rented the next day. On

October 16, 2025, they went back to the gun range, but this time with Nasser. And on October 24, Ali visited a gun range with S.A. and Y.N., allowing S.A. and Y.N. to practice with his Sabre rifle while they were there.

As the documented chronology of Ali's preparations with his co-conspirators demonstrates, he planned for months to carry out his charged mass shooting. And when asked directly whether he intended to carry out the planned attack a week before his arrest, Ali did not hesitate—he said he would "love to." It is difficult to imagine offense conduct that more clearly justifies pretrial detention.

**b. The weight of the evidence as to Ali's dangerousness**

In the Sixth Circuit, the weight of the evidence in 18 U.S.C. § 3142(g) refers to the evidence of a defendant's dangerousness, not guilt. *Stone*, 608 F.3d at 948. And the evidence of the danger that Ali poses to the community if released is staggering. While Ali argues that any danger he poses is ameliorated by the fact that he no longer has access to weapons, this misstates the true nature of Ali's dangerousness. Less than 12 months ago, Ali's support for ISIS led him to conspire with others to inflict massive casualties in the name of radical religious beliefs. It is unlikely that Ali has discarded those beliefs in such a short span of time. And just because the FBI has removed the previously acquired weapons from Ali's home does not prevent him from acquiring new weapons, or from using something more easily accessible—such as a vehicle, like other ISIS attackers—to inflict injury, or

even death, on innocent people.[5] Indeed, Ali was a member of a Telegram groups where others shared ISIS materials that provided exactly this type of instruction on how to inflict maximum death and destruction even without the firearms. And the Court can set no conditions of bond to reasonably prevent this grim possibility.

**c. Ali's history and characteristics**

The government recognizes that Ali—like many would-be terrorist attackers who are disrupted by law enforcement—has no serious prior convictions. And if Ali were charged with a different crime, that fact may even weigh in favor of release. But with crimes of terrorism, radicalization is as significant as criminal history. The January 2025 ISIS-inspired attacker in New Orleans had no significant criminal history and was an honorably discharged U.S. Army veteran. Omar Mateen, the ISIS-inspired Pulse Nightclub attacker, who was particularly inspiring to Ali and his co-conspirators, had no criminal history. Neither did the San Bernardino ISIS-inspired attackers who killed 14 people and wounded 22 others in December 2015. And the Tsarnaev brothers, an inspiration to these conspirators, likewise had no criminal convictions prior to perpetrating their attack.

---

[5] As noted above, the January 2025 New Orleans ISIS attacker used a truck to perpetrate an attack that killed 15 people. More recently, on July 25, 2026, a 21-year-old with ties to ISIS drove a van into a crowd at a Pride Day celebration in Berlin, killing one person and injuring dozens more. The suspect died in a shootout with police after a 24-hour manhunt. *See* https://www.cbsnews.com/news/berlin-germany-pride-attack-abdul-ballout-isis/.

Radicalization matters in terrorism crimes, and the evidence here shows that Ali was radicalized and motivated to commit a mass casualty attack on behalf of ISIS before his arrest. So, despite his lack of criminal history, his history and characteristics still weigh in favor of his detention on these charges.

#### d. The nature and seriousness of the danger Ali poses to the community

In October 2025, Ali and his co-conspirators were poised to inflict unspeakable harm in the name of ISIS, a violent terrorist organization. In the span of just a few months leading up to that, Ali and his co-conspirators stockpiled an arsenal of weapons and ammunition, practiced shooting at gun ranges, scouted potential locations for an attack, researched other ISIS-inspired mass shootings, and consumed violent ISIS propaganda to prepare for their own martyrdom. Ali cannot extract himself from these allegations. And he cannot credibly argue that they favor his release on bond pending trial. Thus, the nature and seriousness of the danger that Ali poses to the community if released weighs heavily in favor of his continued detention.

## III. Ali is also a flight risk

Ali's own motion confirms several facts that heighten, rather than diminish, his risk of flight. As Ali acknowledges, Pretrial Services found some risk of nonappearance based on his possession of travel documents, his history of prior overseas travel, his cash assets, and his "unknown ties." (ECF No. 123,

PageID.659–60). Ali argues that the first three of these factors can be "neutralized" through conditions, and that the fourth is mere "speculation" because the ties are unknown even to him. (*Id.* at PageID.659). The evidence says otherwise.

In his motion, Ali discloses that he has traveled internationally on multiple occasions—twice to Saudi Arabia and twice to Egypt. (*Id.*, PageID.657). That history of repeated foreign travel, combined with Ali's documented and repeated contact with other ISIS-supporters like Jimenez-Guzel and Mirreh—individuals who attempted to flee the United States shortly after learning of Ali and his co-conspirators' arrests, and who have since pled guilty to conspiring to provide material support or resources to ISIS—illustrates precisely why the "unknown ties" identified by Pretrial Services are a legitimate and serious concern rather than idle speculation. Given Ali's demonstrated affinity for ISIS, his direct connections to a network of individuals who took concrete steps to leave the country rather than face arrest, his own history of international travel, and the long list of young men like Ali who have left the United States (and countries around the world) to join ISIS, it is not a stretch to conclude that Ali would make the same choice if released, particularly when he now faces the severe consequences of the charges against him. No condition of release can reliably eliminate that risk.

## IV. No evidentiary hearing or live testimony is required

Ali also asks the Court to require the government to present live testimony or additional evidentiary support beyond its proffer, citing *United States v. Gaviria*, 828 F.2d 667 (11th Cir. 1987), and the panel's observation in *Stone* that a district court required the government to present a witness in that case. *Stone*, 608 F.3d at 948. (ECF No. 123, PageID.661). But the discretion that the Eleventh Circuit found was available in *Gaviria* and that the district court exercised in *Stone* does not compel an evidentiary hearing or witness testimony here. The government's proffer is not a bare recitation of the Indictment's allegations; it is grounded in a description of the extensive documentary and physical evidence—recorded phone calls, WhatsApp messages, financial and purchase records, cell-site and security-camera records, and items recovered pursuant to judicially authorized search warrants—much of which consists of Ali's own recorded statements and communications. This evidence has also been produced or made available to the defense in discovery. Nothing in the Bail Reform Act or Sixth Circuit precedent requires the government to convert a detention hearing into a mini-trial where, as here, the proffered evidence is detailed, corroborated across multiple sources, and substantially undisputed as to its content. *See Stone*, 608 F.3d at 948 (6th Cir. 2010) (conducting a bail hearing by proffer is acceptable under the law); *United States v. Webb*, 238 F.3d 426 (6th Cir. 2000) (unpublished) ("The

government may proceed in a detention hearing by proffer or hearsay."). Two Magistrate Judges in this case have been able to render a detention decision based off of the government's proffer, and the same should be true for Ali.

## **Conclusion**

Ali should remain detained pending trial in this case.

JEROME F. GORGON JR.
United States Attorney

*s/ Hank Moon*
Erin L. Ramamurthy
Hank Moon
Assistant United States Attorneys
211 West Fort, Suite 2001
Detroit, Michigan 48226-3211
(313) 226-0220

*s/ John Cella*
John Cella
Trial Attorney
National Security Division
Counterterrorism Section
950 Pennsylvania Ave NW
Washington, DC 20530
Telephone: (202) 514-2007
E-mail: John.Cella@usdoj.gov

August 24, 2026

**CERTIFICATE OF SERVICE**

I hereby certify that on August 24, 2026, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*s/ Hank Moon*
Hank Moon
Assistant U.S. Attorney